IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, *et al.*,<br><br>    Plaintiffs,<br>v.<br><br>U.S. FISH AND WILDLIFE SERVICE, *et al.*,<br><br>    Defendants. | 21 Civ. 5706 (LJL) |

**DECLARATION OF DANIEL E. ESTRIN**

I, DANIEL E. ESTRIN, declare as follows:

  1.  I have personal knowledge of the matters asserted in this declaration, and if called upon to testify would state the same.

  2.  I am the General Counsel and Advocacy Director of Waterkeeper Alliance, Inc. ("Waterkeeper"), one of the Plaintiffs herein. I have held my current position for nearly seven years and have worked with the Waterkeeper movement in various capacities for more than 30 years. As Waterkeeper's General Counsel and Advocacy Director, I am responsible for supervising Waterkeeper's legal and advocacy work, including all litigation to which Waterkeeper is a party. In addition to my position as a Waterkeeper executive staff member, I am also an individual supporting member of Waterkeeper.

  3.  Waterkeeper is a not-for-profit membership corporation organized under the laws of the State of New York and is recognized by the Internal Revenue Service as a charitable corporation under section 501(c)(3) of the Internal Revenue Code. Waterkeeper maintains its headquarters at 180 Maiden Lane, Suite 603, New York, New York 10038. We are a global movement of on-the-water advocates who patrol and protect over 2.75 million square miles of rivers, streams, and coastlines in North and South America, Europe, Australia, Asia, and Africa. Waterkeeper seeks to protect water quality in every major watershed around the world, and to

restore and maintain all waterways as drinkable, fishable, and swimmable, consistent with the goals of the federal Clean Water Act and other environmental laws. Waterkeeper works toward this vision through direct advocacy and through the grassroots advocacy of its Waterkeeper member and affiliate organizations, which Waterkeeper connects and supports to provide a voice for waterways and their ecosystems and communities worldwide.

4. Waterkeeper has two classes of members – licensed organizational members and individual supporting members. Waterkeeper's Board of Directors must approve all organizational members for licensure. Once approved and licensed, member organizations are entitled to vote, through a designated representative, on matters at membership meetings. Among other requirements, member organizations must conform to Waterkeeper's Quality Standards, participate in membership meetings, elect the President of Waterkeeper, and elect the Waterkeeper Council, which is composed of more than 20 member organization representatives. Member organizations, through their elected and designated representatives, elect more than half of Waterkeeper's Board of Directors.

5. Waterkeeper currently connects approximately 280 Waterkeeper member organizations and 55 affiliate organizations in 47 countries on six continents, including approximately 150 member organizations and 15 affiliate organizations licensed by Waterkeeper in the United States (collectively, "U.S. Waterkeeper groups"). Co-Plaintiffs Waterkeepers Chesapeake, Upper Susquehanna Riverkeeper, and Middle Susquehanna Riverkeeper, are all licensed Waterkeeper member organizations.

6. Our U.S. Waterkeeper groups cumulatively have tens of thousands of individual members that live, work, and recreate on waterways and in watersheds across the United States whose interests are adversely impacted and injured by water pollution, environmental degradation, and adverse impacts to ecosystems, endangered and threatened

species, and their habitats. Each U.S. Waterkeeper group is committed to protecting a specific watershed or waterway. They combine firsthand knowledge of their local watersheds with an unwavering commitment to the rights of their communities. Their work includes water quality monitoring, taking enforcement action against polluters, advocating for stronger water and ecosystem protections before legislative and regulatory bodies, and educating and engaging with the public.

7. Waterkeeper Alliance supports its U.S. Waterkeeper groups, and their individual members, through coordinated litigation and other advocacy, as well as by providing a centralized hub for sharing scientific, legal, and administrative resources with these organizations across the country; by expanding local Waterkeepers' ability to positively affect environmental compliance and policy on a national level; by sponsoring educational and capacity-building programs; and by providing legal support to these organizations.

8. The second class of Waterkeeper members is composed of over 15,000 individual supporters who assist Waterkeeper through financial contributions, volunteering, and other vital services. Waterkeeper supports these individual supporting members by advocating on behalf of their environmental, recreational, aesthetic, and other interests in local and national fora, including before legislative bodies, government agencies, and courts of law, and by keeping them informed about environmental issues that impact their waterways, ecosystems, and communities. Waterkeeper's individual supporting members reside throughout the country, with many members living, visiting, and recreating within the current and/or historic range of the Eastern hellbender.

9. Waterkeeper seeks to reduce and prevent pollution, to protect water quality in every major watershed around the world, and to restore and maintain all waterways as drinkable, fishable, and swimmable consistent with the goals of the federal Clean Water Act

("CWA") and other environmental laws. The CWA is the bedrock of Waterkeeper's work in the United States to protect rivers, streams, channels, lakes, reservoirs, wetlands, bays, estuaries, and coastal waters for the benefit of their communities and ecosystems. In addition to the CWA, Waterkeeper also regularly utilizes and relies upon other environmental statutes to achieve our mission, such as the Endangered Species Act ("ESA"). These federal laws are incredibly important because, among other vital attributes, they provide for protection of imperiled species and habitats, and require government agencies to ensure that they won't jeopardize the continued existence of vulnerable species before they make decisions and commit resources to activities such as projects that have potential to cause harm.

10.     For many years, Waterkeeper, U.S. Waterkeeper groups, and our respective individual members have relied on the ESA and other laws to protect endangered, threatened, and other vulnerable species within their watersheds, and at least a dozen U.S. Waterkeeper groups have actively worked to protect the Eastern hellbender. In addition to the Waterkeeper groups that are parties to this lawsuit, for example, Andy Hill, the Watauga Riverkeeper, who is also an individual supporting member of Waterkeeper, has participated in numerous projects intended to quantify the threats to and protect Eastern hellbenders in the Watauga and New River watersheds in North Carolina, including species trend counts, habitat surveys, habitat improvements, and environmental impact studies.

11.     With respect to protecting other species, Waterkeeper was recently a Plaintiff in federal litigation in Florida regarding the impacts of releases of polluted Lake Okeechobee water on endangered Florida manatees. Hudson Riverkeeper, the very first Waterkeeper group, and many other Waterkeeper groups on the east coast of the United States, have worked tirelessly to protect endangered Atlantic and short-nosed sturgeons in the Hudson River, Delaware River, Chesapeake Bay, and other Atlantic Ocean estuaries, and advocate to protect

many other declining fish populations as well. Willamette Riverkeeper in Oregon has enforced the ESA to protect vulnerable salmon and steelhead species in Oregon. Puget Soundkeeper Alliance has brought legal actions to protect the Southern Resident Orca population in the Sailish Sea. These are just a few examples. Waterkeeper groups across the country regularly track, and work diligently every day to protect, populations of indigenous flora and fauna in their watersheds.

12. The Eastern hellbender, the species that is the subject of this lawsuit, is an incredibly unique animal. It is the largest amphibian native to North America, and requires very specific environmental conditions – primarily clean, cold, fast-flowing water and a rocky stream or river bottom – to survive and propagate. These requirements for specific environmental conditions result in the hellbender being considered an "indicator organism," which means that declining hellbender populations are often an indicator that environmental conditions have worsened and no longer support the species.

13. I have personally been fascinated by hellbenders for nearly 50 years since I first encountered one in the wild. When I was about 9 years old, circa 1975, a childhood friend's father took us on a fishing trip to the southern tier of New York State. We were fishing a tributary to the Susquehanna River when my friend's father called out that he "got something," and reeled in an enormous, prehistoric-looking creature that appeared to be some sort of "mutant" salamander. We were shocked by its approximate 20-inch length and its bizarre appearance, with rippled flaps of skin on its sides. We were all simply amazed that a creature such as this could possibly live in our home state of New York. Even my friend's father, who was an experienced recreational fisherman, could not identify the animal's species. After we studied it for a few minutes we were able to remove the hook and release the creature back into the stream. Shortly after returning home, I visited our local library and identified the species in a

book about North American reptiles and amphibians as a hellbender salamander. This encounter left an enormous and lasting impression on me, and I have been a hellbender "fan" ever since.

14. I spend as much time as possible outdoors and regularly recreate in wild natural areas, including areas that make up the Eastern hellbender's historic range, such as portions of Pennsylvania, West Virginia, and North Carolina. In fact, I just returned this week from hiking the Appalachian Trial during a 3-day visit to Pennsylvania. Outdoor recreation – camping, hiking, trail running, paddling, and swimming – are extremely important parts of my and my family's lives. A major reason for that is our respect for, and appreciation of, nature, and of functioning ecosystems that allow species of all kinds to survive and propagate. My interests in these subjects are especially focused on aquatic ecosystems, and there is no place I would rather spend free time than in and around a healthy and unpolluted river or stream of the kind that can support animals such as the hellbender and wild trout populations, which require specific environmental conditions to survive. These personal interests run so deep that they ultimately led me to focus on environmental science and law for my career, and to become an active member, volunteer, and ultimately the General Counsel of Waterkeeper Alliance, an organization that has effectively focused on water and aquatic ecosystem protection for decades.

15. I believe the deteriorating condition of historic hellbender habitats will harm the prospects for the species, and that it may soon be too late for our government to intervene and save them from extinction. This belief causes me great distress and negatively and directly affects my experiences when I visit the natural areas that I love. Populations of Eastern hellbenders have been plummeting throughout its range for many years, and this fact is not in dispute. Waterways that I have regularly visited where hellbenders used to be regularly found no longer support them. In fact, some experts believe that hellbenders are nearly extirpated from New York State where I first discovered these magnificent animals, and that while some older

animals may still be found in New York streams, there is a lack of evidence that they are reproducing.

16. I am injured by the U.S. Fish and Wildlife's decision that listing the Eastern hellbender as an endangered or threatened species under the ESA was not warranted. The continuing decline of Eastern hellbenders and the destruction of their habitat causes me significant emotional distress, and I cannot understand why the U.S. Fish and Wildlife Service has declined to list the species despite the uncontroverted evidence of its demise throughout so much of its historic range. It saddens me to know there are no remaining hellbenders left in natural areas that I regularly visit and deprives me of the recreational and aesthetic satisfaction I would derive from knowing that these incredible animals, while in trouble, are protected under the ESA and will have a fair opportunity to make a comeback.

17. Vacating Defendant's decision not to list the Eastern hellbender as endangered or threatened under the ESA and remanding the petition to the Fish and Wildlife Service to reconsider its decision under the appropriate legal standards and utilizing the best scientific and commercial data available will redress the above-described injuries to Waterkeeper, Waterkeeper groups, and our respective individual members, including myself, by requiring the Service to reconsider listing the hellbender. I believe that the Service will ultimately have to list the hellbender if it is required to reconsider its decision under appropriate legal standards and evidence.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed this 27th day of October, 2022, in New York, New York.

_____
        Daniel E. Estrin